UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

eCOMMISSION SOLUTIONS, LLC,

                           Plaintiff,

                -v-

CTS HOLDINGS, INC. and CTS SYSTEMS,
INC.,

                       Defendants.

------------------------------------------------------------- X

15-cv-2671 (KBF)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 13, 2017

KATHERINE B. FORREST, District Judge:

On April 6, 2015, plaintiff, eCommission Solutions, LLC ("ECS"), commenced this diversity action against defendants, CTS Holdings, Inc. ("CTS Holdings") and CTS Systems, Inc. ("CTS Systems," collectively, "CTS"). ECS's claims arise from a soured business arrangement and an unsuccessful acquisition attempt.

ECS is in the business of collecting outstanding commissions for travel agents; in 2005 it contracted with a company (Dell Marketing, LP ("Dell")) who in turn subcontracted to CTS, to provide, <u>inter alia</u>, certain invoicing services. Over time, ECS grew unhappy with CTS's services and determined that it would be best to acquire it. Negotiations ensued—but a transaction was never consummated. In this action, ECS claims, <u>inter alia</u>, that CTS made false statements to its clients, lied about data storage, misused ECS's proprietary information in order to compete with it, and then led it down the garden path with regard to CTS's intention to proceed with an acquisition. Finally, ECS alleges that after CTS rejected a letter of intent regarding an acquisition, Dell terminated its agreement, leaving ECS

without CTS's subcontracted services.  ECS alleges further that to make matters worse, Dell and CTS thereafter began to solicit its clients and made a number of misrepresentations in connection therewith.  This lawsuit followed.

ECS has asserted claims for promissory fraud, negligent misrepresentation, unfair competition, defamation, intentional interference with contractual relations, breach of contract, and unjust enrichment.  For the reasons set forth, ECS's motion is GRANTED IN PART and DENIED IN PART.

I.    PROCEDURAL HISTORY

This action was first commenced in New York State Court on March 26, 2015, by eCommission Solutions, LLC against CTS.  The action was timely removed to federal court on April 6, 2015; an amended complaint was filed on May 29, 2015. (ECF Nos. 1, 13.)

On August 5, 2015, CTS moved to dismiss all claims on virtually identical bases as those now before the Court, with the exception, <u>inter alia</u>, of arguments in support of dismissal of a Lanham Act claim.  On March 25, 2016, the Court granted dismissal of that claim but allowed ECS to amend the complaint to allege diversity as a basis for subject matter jurisdiction.  (ECF No. 40.)  The Court did not reach the other asserted bases for dismissal.

ECS filed its second amended complaint ("SAC") on April 22, 2016.  (ECF No. 41.)  The instant motion to dismiss was brought on June 6, 2016, and was fully briefed as of June 27, 2016.  (ECF Nos. 46, 48, 51, and 53.)  This motion replicates the bases for dismissal raised in the 2015 motion practice.  In support of its motion, CTS has provided two of the relevant agreements between the parties, the Data

Entry and Reconciliation Services Agreement (ECF No. 47-1), and the January 19, 2015 Letter of Intent (ECF No. 47-2).  In opposition, ECS argues that both are outside of the complaint and the Court should disregard them.  ECS further argues that consideration of one of the agreements (the Data Entry and Reconciliation Services Agreement) would be improper because it is incomplete.  Following transfer of this action to this Court, on December 2, 2016, the Court notified the parties that it was converting the motion to one pursuant to Rule 56 of the Federal Rules of Civil Procedure to allow consideration of CTS's arguments regarding the agreements.  In light of such conversion, the parties were provided an opportunity to make additional arguments they deemed appropriate.  The parties did so.  (ECF Nos. 95, 100).  This matter was fully submitted as of December 19, 2016.  (ECF No. 100.)

II.   BACKGROUND

The following facts are drawn from the SAC.

A.   The Parties

ECS is in the business of "collect[ing] and reconcil[ing] . . . commissions from hotels within the travel agency industry."  (Id. ¶ 12.)  In practice, this means that ECS offers travel agencies a suite of services that helps them determine which commissions have been paid and which are outstanding.  (Id. ¶¶ 12-14.)

CTS Holdings and CTS Systems are separately incorporated under Delaware law; they each have a principal place of business in Georgia.  (Id. ¶¶ 7-8.)  ECS alleges that CTS Holdings is the "the principal and alter ego of defendant CTS Systems and stands in the shoes of CTS Systems in its dealings with ECS," but fails

to allege facts supporting such a legal characterization.  (<u>Id.</u> ¶ 9.)  Carl Roberts ("Roberts") is the President and Owner of CTS, (<u>id.</u> ¶ 62), and Mark Lewington ("Lewington") is its CEO, (<u>id.</u> ¶ 31).

> B.   <u>The Eight-Year Business Relationship</u>

On March 11, 2005, a predecessor of ECS executed a Reseller Agreement with Perot Systems, Inc. ("PSI"), a predecessor of Dell Marketing, LP ("Dell").  (<u>Id.</u> ¶ 14.)  Pursuant to the terms of this agreement, Perot Systems (later, Dell) contracted to provide services to assist ECS in delivering reconciliation and commission recovery services to its clients.  (<u>Id.</u>)  At some point, Perot Systems or Dell entered into a subcontract with CTS (the "Subcontract").  Pursuant to this agreement, CTS agreed to provide account receivables and invoicing services to ECS's clients and to operate a software platform to complement ECS's services.  (<u>Id.</u> ¶ 15.)

Both Dell and ECS compensated CTS for its services.  (<u>Id.</u> ¶¶ 16-18.)  For instance, ECS alleges that it "directly compensated CTS for World Payment Services [debt collection] and for CTS's services provided for ECS's clients, including but not limited to rental car transactions by Atlas Travel and Travel Leaders and all transactions for American Express Platinum Cruise."  (<u>Id.</u> ¶ 17.)  But in certain instances, "ECS paid Dell, and Dell compensated CTS."  (<u>Id.</u> ¶ 18.)

ECS alleges that starting in July 2010, CTS misrepresented its data security protocols.  Specifically, Lewington, the CEO of CTS, is alleged to have told Paul Hoffmann ("Hoffmann"), the President and CEO of ECS, that "CTS stored its servers at 'Peak 10,' a secure data facility protected against catastrophes."  (<u>Id.</u> ¶ 31.)  CTS further alleges that Lewington represented to ECS that CTS used Peak

10 "(a) in or around November 2011 in connection with ECS securing [another client]; and (b) in or around October 2010 and November 2013 in connection with ECS securing additional business from [an existing client]." (Id. ¶ 32.) ECS alleges that because CTS stored some of this data at its headquarters, rather than in a secure data facility, these statements were false. (Id. ¶ 35.)

Next, ECS alleges that in 2011 it began experiencing a "substantial spike" in issues with some services CTS provided, leading to its loss of a major client and a need to make financial concessions to others. (Id. ¶¶ 19, 21.) According to ECS, in or around October 2013 and in response to the service problems, ECS, Dell, and CTS began negotiations to amend the Reseller Agreement. (Id. ¶ 46.)

On February 27, 2014, CTS's headquarters were destroyed in a fire. (Id. ¶ 35.) ECS alleges that the fire destroyed information that CTS had represented was stored safely, and that the loss of this information adversely impacted its business. (Id. ¶¶ 36-39.) After the fire, ECS determined that "it could no longer rely on CTS" and abandoned the negotiations relating to the Reseller Agreement; it proposed that it acquire CTS instead. (Id. ¶ 47.)

Thereafter, "in or around March 2014, the negotiations focused on the acquisition of CTS by ECS." (Id. ¶ 48.) The negotiations continued via "numerous telephone calls, e-mails, and in-person meetings," and included discussions about the "terms of the acquisition and valuation methods." (Id.¶ 49.)

On or about October 8, 2014, ECS delivered to CTS a Letter of Intent ("LOI") "for the acquisition of CTS;" CTS refused to execute the LOI. (Id. ¶ 52.) "[O]n or

about December 10, 2014, ECS submitted a second Letter of Intent to CTS," consisting of "renegotiated terms." (Id. ¶ 53.) In December 2014, ECS and CTS signed a nondisclosure agreement and shared documents relevant to the acquisition. (Id.)

ECS alleges further that in January 2015, through "the course of numerous telephone calls and e-mails," "CTS reaffirmed its commitment to the acquisition." (Id. ¶ 54.) In this regard, ECS alleges that, on December 11, 2014, Roberts, the President and Owner of CTS, "stated his commitment to the acquisition of CTS," and then a month later, on January 11, 2015, Roberts stated that he was comfortable with the terms and agreed that the parties should proceed to exchange due diligence requests to further the process of the acquisition of CTS by ECS. (Id. ¶ 70.) ECS further alleges that on January 19, 2015, "Roberts verbally agreed to the terms of the acquisition of CTS by ECS." (Id.)

Also, on January 19, 2015, "ECS provided CTS with executable copies of the final Letter of Intent reflecting the terms verbally agreed upon by ECS and CTS." (Id. ¶ 53.) However, on January 27, 2015, "CTS informed ECS that CTS was no longer willing to proceed with the final Letter of Intent or the acquisition." (Id. ¶ 56.) And on February 5, 2015, "Dell terminated its Reseller Agreement negotiations with ECS and notified ECS that Dell would not renew the Reseller Agreement, which purportedly expired on March 10, 2015." (Id. ¶ 58.)

C.    The Alleged "Scheme to Steal Clients"

After the acquisition fell through, ECS alleges that CTS tried to steal ECS's clients by (1) refusing to return data that was necessary to aid in the transition

process following Dell's termination of the Reseller Agreement; (2) defaming ECS to ECS's clients; and (3) misusing information that belonged to ECS to solicit ECS's clients.  (Id. ¶¶ 1, 60, 65.)  ECS alleges that as a result of CTS's acts "some of [it's] clients have terminated their relationships [] and directly contracted with CTS." (Id. ¶ 64.)

Regarding the alleged defamation, ECS alleges the following:  In February 2015, Roberts contacted ECS client Travel Leaders and told them "ECS would be unable to provide commissions reconciliation services to its clients without the input of CTS and Dell."  (Id. ¶ 62.)  Roberts also suggested that Travel Leaders look for alternative vendors or engage CTS directly.  (Id. ¶ 93.)

ECS alleges that CTS used proprietary information concerning ECS's client base and pricing model "to undercut ECS's prices and provide predatory bids to ECS's clients to steal the clients from ECS."  (Id. ¶¶ 40-42.)  In this regard, ECS alleges that "in or around December 2014" "CTS used its knowledge of ECS's pricing structure to undercut ECS's contract with Travel Leaders."  (Id. ¶ 43.)  While placing this bid, CTS also "affirmatively told ECS that CTS did not make a direct bid to Travel Leaders."  (Id. ¶ 44.)  CTS acted "in a similar manner" with other clients, including "Balboa Travel, Tzell (including numerous associated branches), and Direct Travel."  (Id. ¶ 45.)

## III.  STANDARDS OF REVIEW

As set forth in the procedural history above, on December 12, 2016, this Court converted the motion to one pursuant to Rule 56, for the purposes of being able to consider the two documents CTS proffered—the Data Entry and

Reconciliation Services Agreement and the January 19, 2015 Letter of Intent. Those contracts are relevant to ECS's claims for promissory fraud (the First Cause of Action) and breach of contract (the Sixth Cause of Action). The Court therefore analyzes those claims pursuant to Rule 56. The Court reviews the remaining claims (the Second, Third, Fourth, Fifth, Seventh, Eight and Ninth Causes of Action) pursuant to Rule 12(b)(6).

 A. <u>Federal Rule of Civil Procedure 12(b)(6)</u>

 To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must provide grounds upon which his claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). The complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010) (quoting <u>Twombly</u>, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

 In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." <u>Id.</u> The Court gives "no effect to legal conclusions couched as factual allegations." <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555). A plaintiff may plead facts alleged upon information and belief "where the facts are

peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010).  But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate.  Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at 679).

    B.    Federal Rule of Civil Procedure 9(b)

    Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies to the First and Second Causes of Action (promissory fraud and negligent misrepresentation).  Aetna Cas. and Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 579 (2d Cir. 2005).  Specifically, Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Second Circuit has explained that in order to comply with Rule 9(b) "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  Plaintiff must also "plead the factual basis which gives rise to a strong inference of fraudulent intent."  Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 478 F. App'x 679, 681 (2d Cir. 2012) (quoting O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)). "A strong inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or

(b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Id. (quoting Lerner, 459 F.3d at 290-91).

C.      Federal Rule of Civil Procedure 56(a)

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322-23.

In making a determination on summary judgment, a court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment[.]" Porter v.

10

Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it[.]" Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

IV.    ANALYSIS

A.    First Cause of Action: "Promissory Fraud"

ECS's First Cause of Action is for promissory fraud. To state a claim for promissory fraud under New York law, "a plaintiff must allege that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146,

153 (2d Cir. 1995).  Fraud allegations are subject to Rule 9(b)'s requirements.
Aetna Cas. and Sur. Co., 404 F.3d at 579.  "In the appropriate circumstances, a
claim of fraud may be dismissed on the pleadings because as a matter of law a
plaintiff will not be able to establish that reliance on the alleged representation was
reasonable." Wurtsbaugh v. Banc of Am. Sec. LLC, No. 05 Civ. 6220 (DLC), 2006
WL 1683416, at *6 (S.D.N.Y. June 20, 2006) (citing Emergent Capital Inv. Mgmt.,
LLC v. Stonepath Grp., Inc., 343 F.3d 189, 196 (2d Cir. 2003)).

"In assessing the reasonableness of a plaintiff's alleged reliance, [courts]
consider the entire context of the transaction, including factors such as its
complexity and magnitude, the sophistication of the parties, and the content of any
agreements between them." Emergent Capital, 343 F.3d at 195.  "When plaintiffs
are sophisticated parties and the statement or omission relates to a business
transaction that has been formalized in a contract, New York courts are generally
reluctant to find reliance on oral communications to be reasonable." Wurtsbaugh,
2006 WL 1683416, at *6 (citing id. at 196).  This reluctance stems from the view
that "a party will not be heard to complain that he has been defrauded when it is
his own evident lack of due care which is responsible for his predicament."
Emergent Capital, 343 F.3d at 195 (quoting Rodas v. Manitaras, 552 N.Y.S.2d 618,
620 (App. Div. 1990)).

ECS's promissory fraud claim is based on its allegation that from March 2014
through February 2015, "CTS made numerous representations regarding [its]
intent to agree to an acquisition of CTS by ECS." (Compl. ¶ 69.)  ECS alleges three

promises: (1) "[o]n or about December 11, 2014 . . . Roberts stated his commitment to the acquisition of CTS by ECS and his approval of many of the terms in the second Letter of Intent"; (2) "on or about January 11, 2015, in a conversation with ECS, Roberts stated that he was comfortable with the terms agreed upon between the parties and agreed that the parties should proceed to exchange due diligence requests to further the process of the acquisition of CTS by ECS"; and (3) "on or about January 19, 2015, Roberts verbally agreed to the terms of the acquisition of CTS by ECS." (Compl. ¶ 70.)

This claim fails for the simple reason that none of these statements support an actionable promise. On their face, CTS's (and Robert's) statements regarding a potential acquisition were, at most, positive statements as to the likelihood and desire of a mutually acceptable agreement. But the allegations make clear that the negotiations—occurring over a period of more than a year—were never finalized. For instance, ECS alleges that CTS "declined" the October 18, 2014 Letter of Intent, and upon being presented with the December 10, 2014 Letter of Intent, CTS continued to negotiate terms, leading to ECS sending the January 19, 2015 Letter of Intent. (Id. ¶¶ 52-55).[1] Moreover, even Robert's January statement regarding the acquisition was contingent on a due diligence process. (Id. ¶ 70.) Thus, regardless of the oral statements of a desire to transact, the rejection of the written

---

[1] CTS provides the Court with the January 19, 2015 Letter of Intent, and argues that the Court should consider it as integral to the complaint. (ECF No. 47-2.) ECS opposes the incorporation of this document, arguing that it is not integral to the complaint. (Pl.'s Mem. Opp'n 7-8, ECF No. 51.) Because ECS premises its claim only on the oral representations, it is not clear that this document is integral to the complaint and the Court does not consider the proffered document.

proposals along with ongoing due diligence make clear that the statements were not an actionable misrepresentation "[of] an existing fact, but rather one of a possible future contingency, which required the consideration of many factors before it occurred." Brumbauch v. Rensselaer Polytechnic Inst., 510 N.Y.S.2d 762, 764 (App. Div. 1987); see also Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992) ("[P]romissory statements as to what will be done in the future are not actionable." (quoting Sabo v. Delman, 143 N.E.2d 906, 908 (N.Y. 1957))).  Moreover, the fact that ECS and CTS are sophisticated business parties means that these alleged oral representations are not actionable.  See Emergent Capital, 343 F.3d at 196 (dismissing promissory fraud claim premised on oral representations between sophisticated business parties); Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997) (dismissing promissory fraud claim premised on oral representations when the plaintiff could have protected itself with a written contractual provision).

The Court also finds that ECS has failed to allege the requisite state of mind with regard to any of the alleged promises.  Rule 9(b) requires that ECS allege facts giving rise to a strong inference of fraudulent intent.  But in this regard, ECS alleges in a conclusory fashion that "[a]t the time that Roberts made these statements, Roberts and CTS had no intention of agreeing to the acquisition of CTS by ECS."  (Compl. ¶ 71.)  This statement is facially insufficient.  See Murray v. Xerox Corp., 811 F.2d 118, 122 (2d Cir. 1987) ("Under New York law, fraudulent intent is not demonstrated by evidence of mere non-performance of a promise.");

14

Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 576 (2d Cir. 1969) (finding that a similar allegation was "plainly insufficient to state a claim for fraud under Rule 9(b)"). Accordingly, the Court dismisses the First Cause of Action.

B.    Second Cause of Action: "Negligent Misrepresentation"

ECS's Second Cause of Action is for negligent misrepresentation. "Such a claim must be pled in accordance with the specificity criteria of Rule 9(b)." Aetna Cas., 404 F.3d at 583. "To prevail on a claim of negligent misrepresentation under New York law, a plaintiff must show '(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 490 (2d Cir. 2014) (quoting J.A.O. Acquisition Corp. v. Stavitsky, 863 N.E.2d 585, 587 (N.Y. 2007)); accord Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1109-10 (N.Y. 2011).

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Id. at 194. The New York Court of Appeals has further explained that although the "vast majority of commercial transactions are comprised of . . . 'casual' statements and contacts," a commercial transaction may nonetheless create a special relationship when "there [is] some identifiable source of

15

a special duty of care." <u>Kimmell v. Schaefer</u>, 675 N.E.2d 450, 454 (N.Y. 1996).  The New York Court of Appeals further found that a special relationship existed where defendants, who were trying to convince plaintiffs to invest in a construction project, "initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." <u>Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank</u>, 250 F.3d 87, 103 (2d Cir. 2001) (citing <u>Kimmell</u>, 675 N.E.2d at 454).  In other words, as the Second Circuit summarizes, "a relationship sufficiently special to justify reliance (and a subsequent action for negligent misrepresentation) may arise when a person 'wholly without knowledge seek[s] assurances from one with exclusive knowledge.'" <u>Eternity Global Master Fund</u>, 375 F.3d at 189 (quoting <u>Heard v. City of New York</u>, 623 N.E.2d 541 (N.Y. 1993)).  The Second Circuit has also held that "a sparsely pled special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where the complaint emphatically alleges [that the speaker had a unique or special expertise and was aware of the use to which the information would be put and supplied it for that purpose.]" <u>Id.</u>, at 188.

Further, "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might not ever come to fruition." <u>Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.</u>, 227 F.3d 8, 20-21 (2d Cir. 2000).  And "intent is not an element of a negligent misrepresentation claim." <u>Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.</u>, 910 F. Supp. 2d 543, 548 (S.D.N.Y. 2012); <u>accord</u> <u>CeltixConnect Equity Investors LLC v. Sea Fibre Network Ltd</u>, No.

653340/2014, 2016 WL 3917648, at *9 (N.Y. Sup. Ct. 2016) ("[F]raud requires actual intent to defraud while negligent misrepresentation, as its name suggests, does not.").

ECS bases its negligent misrepresentation claim on two sets of allegations. First, ECS argues that CTS misrepresented "CTS's intentions regarding the acquisition of CTS by ECS." (Compl. ¶ 80.) The Court dismisses this basis for the claim because (1) ECS's reliance on CTS's oral statements was unreasonable (as the Court explained in relation to the First Cause of Action); and (2) "[p]romises of future conduct are not actionable as negligent misrepresentations." Hydro Inv'rs, Inc., 227 F.3d at 20-21 (dismissing negligent misrepresentation claim where alleged statement was promise of future output and holding that "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition"); Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987) (dismissing negligent misrepresentation claim based on the promise to hire someone in the future).

ECS's second basis for this claim is that the parties were engaged in a multi-year business relationship during which CTS repeatedly misrepresented its "data security and storage." (Compl. ¶ 80.) Specifically, ECS alleges that in July 2010, Hoffmann, the President and CEO of ECS, contacted Lewington, the CEO of CTS, and made an "inquir[y] regarding CTS's data security and storage measures." (Id. ¶ 30.) In response, "Lewington assured Hoffmann that CTS stored its servers at 'Peak 10,' a secure data facility protected against catastrophe." And Lewington also

"made identical representations to Hoffmann" on at least two other occasions: "(a) in or around November 2011 in connection with ECS securing BCD as a client; and (b) in or around October 2010 and November 2013 in connection with ECS securing additional business from Amex." (Id. ¶ 32.)  Subsequent to these representations, on February 27, 2014, CTS's headquarters were destroyed in a fire.  (Id. ¶ 35.)  ECS alleges that the fire destroyed information that CTS had represented was stored safely, and that the loss of this information adversely impacted its business.  (Id. ¶¶ 36-39.)

The Court finds that these allegations support a negligent misrepresentation claim.  ECS satisfies the latter two elements of the cause of action—incorrect information and reasonable reliance—because it alleges the time, place, and content of the false statements, for which reliance was reasonable given that ECS explicitly asked CTS about its data security measures.  (Compl. ¶¶ 31-35.)  As for the special relationship element, the Court finds that, at this stage, the allegations are sufficient given that the Second Circuit has held that "a sparsely pled special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where the complaint emphatically alleges [that the speaker had a unique or special expertise and was aware of the use to which the information would be put and supplied it for that purpose.]"  Eternity Global Master Fund, 375 F.3d at 188.  Here, ECS pleads that CTS had unique knowledge—i.e., CTS's knowledge over its internal data procedures.  And ECS pleads that CTS was plausibly aware of the purpose for which the information was being used, as

demonstrated by the fact that CTS made the representation in response to specific inquiries.  At this stage, this is sufficient to state a claim for negligent misrepresentation.  See id.; see also Kimmell, 675 N.E.2d at 454 (holding that a special relationship existed outside of the context of professionals, such as lawyers and engineers, when a defendant was inter alia "uniquely situated to evaluate the economics of the [investment that defendant sold to plaintiff]"); Wells Fargo Bank Nw., N.A. v. Taca Intern. Airlines, S.A., 247 F. Supp. 2d 352, 366 (S.D.N.Y. 2002) (finding that a special relationship was sufficiently plead between a lessee and lessor, when the complaint alleged that several of the defendant's agents "made expert representations about maintenance costs" based on their "unique expertise").

C.    Third Cause of Action: "Unfair Competition"

ECS's Third Cause of Action is for unfair competition.  "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 197 (2d Cir. 2001) (quoting Katz Dochrermann & Epstein, Inc. v. Home Box Office, No. 97 Civ. 7763 (TPG), 1999 WL 179603, at *4 (S.D.N.Y. Mar. 31, 1999)).  Unfair competition is a "broad and flexible doctrine" that encompasses an "incalculable variety of illegal practices." Berman v. Sugo LLC, 580 F. Supp. 2d 191, 208-09 (S.D.N.Y. 2008) (quoting Roy Export Co. Establishment v. Columbia Broad. Sys. Inc., 672 F.2d 1095, 1105 (2d Cir. 1982)); see also Roy Export, 672 F.2d at 1105 ("[New York's law of unfair competition] has been broadly described as

encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown.").

It is well settled under New York law that an employee's "[s]olicitation of [the employee's former] employer's customers" "is not actionable unless the customer list could be considered a trade secret or there was wrongful conduct by the employee such as physically taking or copying the employer's files or using confidential information." Amana Express Int'l, Inc. v. Pier–Air Int'l, Ltd., 621 N.Y.S.2d 108, 109 (App. Div. 1995); see also Leo Silfen, Inc. v. Cream, 278 N.E.2d 636, 639 (N.Y. 1972) ("If there has been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service."). Courts similarly require some form of misappropriation in claims arising from non-employment business relationships. See, e.g., Telecom Int'l Am., 280 F.3d at 197 (dismissing unfair competition claim brought against plaintiff's former service provider because the complaint failed to allege misappropriation or "bad faith"); Gagnon Bus Co. v. Vallo Transp., Ltd., 786 N.Y.S.2d 107, 108 (App. Div. 2004) (dismissing unfair competition claim brought against a former subcontractor because plaintiff did not allege misappropriation); Sit-Up Ltd. v. IAC/InterActiveCorp., No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *20 (S.D.N.Y. Feb. 20, 2008) (granting summary judgment in part to an unfair competition claim that arose from an unconsummated acquisition, and reasoning that the contractual non-disclosure agreement defined what constituted misappropriated information).

In the Third Cause of Action, ECS alleges that CTS engaged in acts of unfair competition by using information about "ECS's client base and ECS's pricing model to undercut ECS's prices and provide predatory bids to ECS's clients to steal the clients from ECS." (Compl. ¶¶ 42; see also id. ¶¶ 40, 85-90.) CTS argues that it cannot be held liable for unfair competition because ECS does not allege that CTS acted improperly in obtaining ECS's Information. (Defs.' Mem. 28, ECF No. 48.)

Although CTS is correct that ECS does not plead facts establishing that any data was misappropriated, the Court finds that the complaint alleges activities that nonetheless—at this stage—make a claim for unfair competition plausible. Specifically, ECS alleges that, while the two companies were negotiating, CTS used its knowledge of ECS's customer information to place a bid and then also represented to ECS that it had not placed such a bid. (Compl. ¶¶ 43-44.) CTS's act of misrepresenting its use of data that it had ongoing access to because of its role as a subcontractor provides, at this stage, the requisite "fraud or deception" required to sustain an unfair competition claim. Telecom Int'l Am., 280 F.3d at 197.

D.   Fourth Cause of Action: "Defamation"

 ECS's Fourth Cause of Action is for defamation. Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander. Best Van Lines, Inc. v. Walker, 490 F.3d 239, 245 n.7 (2d Cir. 2007). Under well-established New York law, "truth is an absolute, unqualified defense to a civil defamation action." Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 301 (2d Cir. 1986). "But in defamation law, as in life, determinations of fact and fiction are not zero-sum. In New York, a statement need not be completely

true, but can be substantially true, as when the overall gist or substance of the challenged statement is true." <u>Chau v. Lewis</u>, 771 F.3d 118, 129 (2d. Cir. 2014). Substantial truth is determined by seeing whether the defamatory statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." <u>Fleckenstein v. Friedman</u>, 193 N.E. 537, 538 (N.Y. 1934); <u>see also</u> <u>Guccione</u>, 800 F.2d at 302 (applying <u>Fleckenstein</u> and finding that a statement implying that the plaintiff was an adulterer, though technically false, conveyed the same effect as the literal truth that the plaintiff was a "former long-time adulterer").

In the Fourth Cause of Action, ECS alleges that CTS committed defamation by contacting "in writing, by telephone, or in person" a client of ECS, and communicating that "Dell concluded its relationship with ECS and that ECS would be unable to continue to provide commissions reconciliation services to ECS clients." (Compl. ¶¶ 92-93.)  This claim fails.

The allegations in the complaint themselves support the truth of the alleged defamation.[2]  For instance, as part of its promissory fraud claim, ECS alleges that CTS was "withholding data files which <u>were necessary</u> for ECS to perform under its agreements with its clients."  (Compl. ¶ 102 (emphasis added); <u>see also id.</u> ¶ 65 ("CTS has refused to return to ECS data of clients of ECS, which data is necessary

---

[2] "[C]ourts may grant a pre-answer motion to dismiss on the basis of an affirmative defense where such defense appears on the face of the complaint."  <u>Silver v. Kuehbeck</u>, 217 F. App'x 18, 22 (2d Cir. 2007); <u>see also</u> <u>Biro v. Conde Nast</u>, 883 F. Supp. 2d 441, 459 (S.D.N.Y. 2012) (dismissing some defamation claims on the basis that a substantial truth defense appeared on the face of the complaint).

to aid in the transition process.").)  And ECS alleges that because of its reliance on the failed negotiations that it "did not pursue developing an alternative software platform or relationships with other contract partners or have sufficient time to implement a transition plan for existing ECS clients."  (Compl. ¶ 75.)  Thus, based on these allegations, the Court finds that CTS's statement that ECS "would be unable to continue to provide commissions reconciliation services to ECS clients" was substantially true.  (Compl. ¶ 93.)  Accordingly, the Court dismisses the Fourth Cause of Action.

      E.      <u>Fifth Cause of Action: "Intentional Interference With Contractual Relationships"</u>

ECS's Fifth Cause of Action is for intentional interference with contractual relationships.  "The tort of intentional interference with contractual relations is comprised of four elements: (1) the existence of a contract, enforceable by the plaintiff, (2) the defendant's knowledge of the existence of that contract, (3) the intentional procurement by the defendant of the breach of the contract, and (4) resultant damages to the plaintiff."  <u>Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.</u>, 744 N.Y.S.2d 384, 391 (App. Div. 2002); <u>accord</u> <u>Enercomp, Inc. v. McCorhill Pub., Inc.</u>, 873 F.2d 536, 541 (2d Cir. 1989).  The interference "must be intentional, not merely negligent or incidental to some other, lawful purpose." <u>Alvord & Swift v. Stewart M. Muller Const. Co.</u>, 385 N.E.2d 1238, 1241 (N.Y. 1978). "The defendant's acts must be without reasonable justification.  However, actual malice is not a requirement."  <u>See</u> <u>KSL Recreation Corp. v. Boca Raton Hotel and</u>

Club, 637 N.Y.S.2d 261, 264 (Sup. Ct. 1995) (citing A.S. Rampell, Inc. v. Hyster Co., 144 N.E.2d 371, 376 (N.Y. 1957)).

In the Fifth Cause of Action, ECS alleges that CTS "induced ECS's clients to breach their contracts with ECS, which clients such as Travel Leaders, Tzell (including numerous associated branches), and Maritime Travel ultimately did." (Compl. ¶ 103.) Although ECS alleges that contracts existed, ECS has not plead any factual content regarding the contract terms that were breached, or the third-party conduct that amounted to breach. Accordingly, ECS has not adequately plead the existence of a contract, and the Court dismisses the Fifth Cause of Action. See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., 455 F. App'x 102, 104 (2d Cir. 2012) (dismissing an intentional interference claim that merely alleged that the plaintiff "had a longstanding agreement with [the defendant]."); Childers v. N.Y. & Presbyterian Hosp., 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014) ("A complaint 'fails to sufficiently plead the existence of a contract' if it does not 'provide factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms.'" (quoting Valley Lane Indus. Co. v. Victoria's Secret Direct Brand, 455 F. App'x 102, 104 (2d Cir. 2012))); cf. Washington Ave. Assocs., Inc. v. Euclid Equip., Inc., 645 N.Y.S.2d 511, 512 (App. Div. 1996) ("The plaintiff's contention that [defendant] breached the [contact] because of the appellant's actions, without a factual basis to support it, was insufficient to state a cause of action against the appellant for tortious interference with contractual relations.").

F.    Sixth Cause of Action: "Breach of Contract"

In the Sixth Cause of Action, ECS claims that as a third-party beneficiary it is entitled to receive damages from CTS for the service issues that amounted to a breach of the Dell-CTS Subcontract.  (Compl. ¶¶ 107-113.)  In its motion to dismiss, CTS submits the Data Entry and Reconciliation Services Agreement and argues that this document is the Subcontract and should be (1) considered by the Court; (2) construed under Texas law, as its choice-of-law clause selects; and (3) interpreted so as to find that ECS is not a third-party beneficiary.  (Defs.' Mem. 30-33.)  In response, ECS disputes that the proffered Data Entry and Reconciliation Services Agreement is a complete copy, and further argues that it is not integral to the complaint.  (Pl.'s Mem. Opp'n 7-8, ECF No. 51.)

In light of the supplemental briefing,[3] the Court finds that the Data Entry and Reconciliation Services Agreement is integral to the complaint because it is the Subcontract that was allegedly breached—but in all events the motion was converted to one governed by Rule 56 of the Federal Rules of Civil Procedure.  (See Compl. ¶¶ 15, 100, 108, 110-112; ECF No. 95 ¶ 8.)  The Court further finds that there is no triable issue on the completeness of the Subcontract.  (ECF No. 95 ¶ 2.)  Finally, the Court dismisses ECS's breach of contract claim because ECS fails to allege any details regarding the Subcontract's terms, including failing to specify which term was allegedly breached.

---

[3] As explained above, the Court notified the parties that it was converting CTS's motion to dismiss to a motion "pursuant to Federal Rule of Civil Procedure 56 for purposes of receiving and considering the parties' arguments regarding " inter alia the Subcontract (ECF No. 92, at 1), and ordered supplemental briefing.  (ECF Nos. 95, 100.)

1.    <u>Texas Contact Law</u>

Assuming that Texas law applies to the Subcontract,[4] third parties have

standing and may recover on a contract made between other parties "if the parties

intended to secure some benefit to that third party, and only if the contracting

parties entered into the contract directly for the third party's benefit." <u>MCI</u>

<u>Telecom. Corp. v. Texas Util. Elec. Co.</u>, 995 S.W.2d 647, 651 (Tex. 1999).  A party is

"presumed to contract only for its own benefit," and therefore, "contract law

presumes that parties to a contract did not intend to confer a benefit on third

parties." <u>ConocoPhillips Co. v. Graham</u>, No. 11 Civ. 00503 (HB), 2012 WL 1059084,

at *4 (Tex. App. Mar. 29, 2012) (citing <u>In re Bayer Materialscience, L.L.C.</u>, 265

S.W.3d 452, 456 (Tex. App. 2007).  One way a third party can overcome this

presumption is by showing that it is a creditor beneficiary, which is someone to

whom a contract's benefit "will come to . . . in satisfaction of a legal duty owed . . . by

the promisee." <u>Stine v. Stewart</u>, 80 S.W.3d 586, 590 (Tex. 2002) (quoting <u>MCI</u>

<u>Telecommunications Corp.</u>, 995 S.W.2d at 651).  This legal duty may be "an

indebtedness, contractual obligation or other legally enforceable commitment owed

to the third party." <u>Id.</u>  A third-party beneficiary does not have to show that the

---

[4] Subcontract § 9 states that "this agreement shall be governed by the laws of the State of Texas."
The parties do not brief the choice-of-law issues that this clause presents, and instead simply apply
Texas law.  The Court notes that a later motion may find that a different forum's law provides the
appropriate standards.  <u>See</u> <u>Anwar v. Fairfield Greenwich Ltd.</u>, 728 F. Supp. 2d 372, 417 (S.D.N.Y.
2010) ("In general, the choice of law resulting from [the usual contractual choice-of-law analysis] also
binds the third-party beneficiary."); <u>Horton v. Wells Fargo Bank N.A.</u>, No. 16 Civ. 1737 (KBF), 2016
WL 6781250, at *3 (S.D.N.Y. 2016) (setting forth the usual contractual choice-of-law analysis).

signatories executed the contract "solely to benefit [the] non-contracting party." Id. And a "third party beneficiary may be identified in the agreement by a class or category of persons, all of whom may not be known to the contracting parties at the time of execution." Droplets, Inc. v. E*trade Financial Corp., 939 F. Supp. 2d 336, 347 (S.D.N.Y. 2013) (citing ConocoPhillips Co., 2012 WL 1059084, at *6); see also In re Citgo Petroleum Corp., 248 S.W.3d 769, 776 (Tex. App. 2008) ("Although the contract does not name [the third party] specifically, the agreement is sufficiently clear to establish that the parties intended to cover entities in this category and the record establishes [that the third party] is a customer or client of [the signatory].").

2.    Application to the Subcontract

The Subcontract is an agreement between CTS and Perot Systems—which became Dell—requiring CTS to provide reconciliation services to PSI/Dell's clients. (Compl. ¶ 14.)  In relevant part, the Subcontract states that "CTS shall provide to [PSI/Dell] Reconciliation Customers the following services," and then lists services, such as "providing customer support as requested by [PSI/Dell] Reconciliation Customer or [PSI/Dell] personal," and "tak[ing] delivery of checks or other verifications of Commissions paid to [PSI/Dell] Reconciliation Customer." (Subcontract § 4.)  The Subcontract defines a "[PSI/Dell] Reconciliation Customer" as "[a]ny customer contracting with [PSI/Dell] to receive Reconciliation service(s) from [PSI/Dell]." (Subcontract § 1(J).)  And the Subcontract defines "Reconciliation" as "[a] data processing function that consolidates payments, matches reservation information to actual hotel stays or rental car rentals and reports the resulting Commission paid or due." (Subcontract § 1(e).)

27

It is clear that the Subcontract intended to secure a benefit for the class of entities defined as PSI/Dell Reconciliation Customers.  And it is clear that these entities would receive this benefit in satisfaction of legal obligations that PSI/Dell owes to them under separate contractual agreements.  Thus PSI/Dell Reconciliation Customers are creditor beneficiaries that can sue for breach of contract under Texas Law.  See Droplets, Inc., 939 F. Supp. 2d at 350 (applying Texas law and finding a right to sue for breach of contract when an agreement "explicitly defines a class of third parties" and "confers direct benefits that are independent of any benefits conferred [to the contracting parties]").

Given this, the question for determining whether ECS may sue for breach of contract is whether ECS, as a reseller of reconciliation services, is a PSI/Dell Reconciliation Customer.  Although the Court is skeptical of ECS's contention that it is a member of this class, the contract uses language that is sufficiently broad and ambiguous—i.e., "[a]ny customer contracting . . . to receive Reconciliation service(s)" (Subcontract § 1(J))—that this contention is plausible.  (See Compl. ¶ 14.)  However, even if ECS is a third-party beneficiary, the claim nonetheless fails because ECS does not allege, or identify in its filings, the Subcontract's term that was allegedly breached.  Accordingly, the Court dismisses the Sixth Cause of Action.  See, e.g., Childers, 36 F. Supp. 3d at 312 ("To plead the existence of an agreement, a complaint must 'allege the essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated." (quoting Sirohi v. Trs. of Columbia Univ., 162 F.3d 1148,

1998 WL 642463, *2 (2d Cir. 1998) (unpublished))).

       G.    <u>Seventh Cause of Action: "Unjust Enrichment – Service Issues"</u>

ECS's Seventh Cause of Action is for unjust enrichment.  To state a claim for unjust enrichment under New York law, "the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." <u>Mandarin Trading Ltd. v. Wildenstein</u>, 944 N.E.2d 1104, 1110 (N.Y. 2011).

In the Seventh Cause of Action, ECS asserts that in light of the service issues, CTS was unjustly enriched by the payments that ECS made to CTS. (Compl. ¶¶ 114-118.)  Although the complaint alleges that ECS made direct payments to CTS the complaint does not allege any connection between those payments and the service issues.  (<u>See</u> Compl. ¶¶ 17-19.)  That is, it is unclear whether the service issues occurred with the services for which ECS directly paid CTS, or with the services that CTS provided to ECS as Dell's subcontractor.  If the first scenario occurred, then ECS paid CTS for a service that it did not receive. However, if the latter scenario occurred, then ECS paid CTS for services that ECS received in full, which in turn means that CTS was justly paid.  In the absence of any allegations suggesting which scenario occurred, the Court can only speculate as to whether "it is against equity and good conscience to permit" CTS to "retain" ECS's payments.  <u>Mandarin Trading</u>, 944 N.E.2d at 1110.  Accordingly, the Court dismisses the Seventh Cause of Action.  <u>See also</u> <u>IDT Corp. v. Morgan Stanley Dean Witter & Co.</u>, 907 N.E.2d 268, 274 (N.Y. 2009) (dismissing unjust enrichment claim

that failed to allege that defendants' enrichment came from plaintiffs' payments); Old Republic Nat. Title Ins. Co. v. Cardinal Abstract Corp., 790 N.Y.S.2d 143, 145 (App. Div. 2005) ("[T]he plaintiff's allegation that the appellants received benefits, standing alone, is insufficient to establish a cause of action to recover damages for unjust enrichment.").

H.   Eighth Cause of Action: "Unjust Enrichment – Proprietary Information"

In the Eighth Cause of Action, ECS also brings an unjust enrichment claim premised on CTS's use of ECS's proprietary information.  (Compl. ¶¶ 119-125.) Although ECS labels the information that CTS used as "proprietary," ECS does not plead that CTS obtained access to ECS's information through acts outside of the normal course of a business relationship.  That is, ECS has not alleged facts suggesting that it "is against equity and good conscience to permit" CTS "to retain" what ECS seeks to "recover[]."  Mandarin Trading, 944 N.E.2d at 1110. Accordingly, the Court dismisses the Eight Cause of Action.  See also Edelman v. Starwood Capital Grp., LLC, 892 N.Y.S.2d 37, 39 (App. Div. 2009) ("The claim for misappropriation of proprietary information falls short because plaintiffs did not allege that [they] took sufficient precautionary measures to insure that the information remained secret.").

I.   Ninth Cause of Action: "Injunction"

Finally, ECS seeks an injunction "enjoining and prohibiting CTS from using ECS Information to compete with ECS or to attempt to steal clients of ECS." (Compl. ¶ 140.)  A "preliminary injunction is a form o[f] relief, and not a claim or a

cause of action." <u>NAS Elec., Inc. v. Transtech Elec. PTE Ltd.</u>, 262 F. Supp. 2d 134,

149 (S.D.N.Y. 2003).  <u>See also</u> <u>Chevron Corp. v. Donziger</u>, 833 F.3d 74, 119 (2d Cir.

2016) (stating generally that an injunction is a type of relief).  Accordingly, the

Court dismisses the Ninth Cause of Action.

## V.    CONCLUSION

For the reasons set forth above, CTS's motion is GRANTED IN PART and

DENIED IN PART.  The Clerk of Court is directed to terminate the motion at ECF

No. 46.

SO ORDERED.

Dated:      New York, New York
            March 13, 2017


_____
KATHERINE B. FORREST
United States District Judge