| UNITED STATES DISTRICT COURT | USDC SDNY |
| SOUTHERN DISTRICT OF NEW YORK | DOCUMENT |
| | ELECTRONICALLY FILED |
| | DOC #: _____ |
| | DATE FILED: May 1, 2018 |

------------------------------------------------------------ X
:
ECOMMISSION SOLUTIONS, LLC, :
:
                               Plaintiff, :
:
               -v- : 15-cv-2671 (KBF)
:
CTS HOLDINGS, INC. and CTS SYSTEMS, : OPINION & ORDER
INC. :
:
                            Defendants. :
:
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

Over the course of this litigation, plaintiff eCommission Solutions, LLC ("ECS") has asserted as many as twelve causes of action against defendants CTS Holdings, Inc. ("CTS Holdings") and CTS Systems, Inc. ("CTS Systems") (collectively, "CTS" or "defendants"). Not to be outdone, defendants have asserted as many as six counterclaims in response. Now, however, after motion practice and voluntary dismissals[1], only three claims remain: (1) ECS's claim for unfair competition; (2) CTS's counterclaim for unfair competition; and (3) CTS's counterclaim for defamation. The parties have cross-moved for summary judgment. For the reasons set forth below, both motions are GRANTED.

It is worth pausing on this, and stating what is now plain: after several years of complex litigation that has included motion practice, conferences, and discovery

---

[1] Of particular note, ECS represented in its opposition to CTS's motion for summary judgment that "[a]fter an adequate time for discovery, ECS has elected to no longer pursue [its claim for negligent misrepresentation]." (See Mem. of Law of Pl. in Opp'n ("ECS Opp'n") at 3 n.1, ECF No. 146.)

of all sorts, neither party will recover anything at all. Instead, this is one of those business disputes that has led, frankly put, nowhere.

The remaining claims at issue in this Opinion & Order are relatively straightforward: ECS asserts that CTS used information about ECS's client base and pricing model to undercut ECS, causing it to lose business. In response, CTS argues that it lost customers as a result of ECS's conduct, and that ECS made defamatory statements. But all of these claims fail for one very simple reason: neither ECS nor CTS can show that any business was lost as a result of the other's conduct. In addition, as it relates to CTS's counterclaim, there is insufficient factual basis to support the allegation that ECS misappropriated CTS's proprietary information.

I. BACKGROUND

The following facts are derived from the parties' various submissions under Local Civ. R. 56.1[2], as well as certain documents submitted in connection with the pending motions. The facts are undisputed unless otherwise noted.

Both ECS and CTS are in the business of hotel reconciliation—that is, assisting travel agencies in determining whether commissions due as a result of booked hotel rooms have been paid or remain outstanding. As such, ECS and CTS offer similar services and compete for the same customers (namely, travel agencies).

---

[2] The parties' submissions can be found at ECF Nos. 86 (Ex. A and B), 136, 144, 151, and 158. As CTS correctly notes, the submissions at ECF No. 86 were not submitted in connection with either of the pending motions, but rather an unrelated motion directed against claims that were subsequently amended. However, that procedural default does not affect the Court's analysis, which is based on the undisputed facts recited herein.

2

In 1996, CTS developed a suite of software, processes, and systems (collectively, the "CTS Services") designed to assist travel agencies in reconciling their reservations and commissions. Those services are relevant to the present dispute between the parties.

In 2004 and 2005, respectively, CTS and ECS executed separate agreements with Dell Marketing, LP ("Dell"). Those agreements, briefly, were as follows:

- On March 11, 2004, CTS entered into a Data Entry and Reconciliation Services Agreement (the "Services Agreement") with Dell.[3] Pursuant to the Subcontract, CTS agreed to provide the CTS Services to Dell's travel agency customers in exchange for compensation.

- On March 11, 2005, ECS[4] entered into a Reseller Agreement. Pursuant to the Reseller Agreement, Dell agreed to allow ECS to resell certain services that Dell provided to travel agencies, including the CTS Services, in exchange for compensation. CTS was not party to the Reseller Agreement.

As a result of the Services Agreement and the Reseller Agreement, ECS effectively sold the CTS Services to Dell customers, and both ECS and CTS were compensated. ECS and CTS, however, did not have a direct contractual relationship.

For a number of years, this arrangement appears to have worked well for everyone involved. From 2005 until 2013, CTS provided the CTS Services to Dell,

---

[3] Dell is the successor-in-interest to Perot Systems Corp. ("Perot"), which was the actual named party to the Services Agreement referenced above.
[4] ECS is the successor-in-interest to CNG USA, Inc., which was the actual named party to the Reseller Agreement referenced above.

and ECS acted as a reseller, selling the CTS Services to Dell's customers. During that time period, Dell and ECS twice agreed to extend the Reseller Agreement—once in 2009 and once in 2011.

In late 2013, Dell and ECS commenced negotiations on a third extension of the Reseller Agreement. Those negotiations were ultimately unsuccessful, and the Reseller Agreement expired by its terms in March 2015. Once the Reseller Agreement expired, ECS was no longer in a position to sell the CTS Services (as the CTS Services were provided through a distinct Services Agreement between CTS and Dell), and was not immediately able to provide its own.

Before negotiations between Dell and ECS had completely fallen apart, ECS made some attempt to develop its own technology to compete with the CTS Services. ECS additionally attempted to "reverse engineer" certain of the CTS Services in connection with a project for ECS's customer Tzell Travel Group ("Tzell").[5] It is undisputed that ECS's reverse engineering efforts were unsuccessful.

On March 9, 2015, one day before the Reseller Agreement was set to expire, ECS informed its customers that it would be "launching [a] state-of-the-art platform . . . using only ECS infrastructure, resources, and personnel," but that "[t]here will be a short service interruption as we complete our deployment and transition clients." Although certain customers elected to remain with ECS after the Reseller

---

[5] ECS disputes the assertion that it attempted or intended to "reverse engineer" CTS's services, citing evidence that it had little information regarding CTS's "backend schema and codebase." But it is undisputed that ECS employees took "snapshots" of CTS's reporting platform, and that ECS's Chief Technology Officer repeatedly used the term "reverse engineer" to describe ECS's efforts relative to CTS and the Tzell project.

4

Agreement expired (and try out the new platform), it is undisputed that multiple customers subsequently terminated their relationship with ECS and switched back to Dell/CTS. ECS has alleged that it lost those customers because CTS undercut its prices, while CTS argues that those customers left ECS due to functionality issues with ECS's new platform.

With regards to CTS's defamation claim, CTS has identified seven statements (or groups of statements) as potentially defamatory:

1. A statement from Tom Sparico ("Sparico") (a member of ECS's Advisory Committee) to Eric Anschultz (who worked for ABC Corporate Services), in which Sparico said "it was his goal and intention to bankrupt CTS [and] that ECS could go directly with ABC";

2. Two communications in which Sparico referred to CTS's President, Carl Roberts ("Roberts"), as a "nutjob"—once to Mark Lewis ("Lewis") at Dell, and the second time Mark Lewington ("Lewington"), who served as CTS's CEO;

3. Communications from ECS to Dell in 2013 and 2014 stating that CTS's services were bad and that CTS were providing poor services;

4. A March 26, 2014 email from Sparico to Paul Hoffmann ("Hoffman") (ECS's CEO) stating that CTS was failing to perform core services;

5. A March 10, 2015 email from Sparico to Jonathan Hamblett ("Hamblett") (with American Express) stating that CTS's platform was a "verified disaster"; and

6. A memorandum addressed to American Express dated March 8, 2015, that identified certain service issues with CTS.

II. LEGAL PRINCIPLES

A. Summary Judgment Standard

Summary judgment may be granted when a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In reviewing a motion for summary judgment, the Court construes all evidence in the light most favorable to the nonmoving party, and draws all inferences and resolves all ambiguities in its favor. Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). The Court's role is to determine whether there are any triable issues of material fact, not to weigh the evidence or resolve any factual disputes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

B. Unfair Competition

A claim for unfair competition requires proof that the defendant misappropriated the labor of another in bad faith. See Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 197 (2d Cir. 2001); see also Big Vision Private Ltd. v. E.I. DuPont DeNemours & Co., 610 F.Appx. 69, 71 (2d Cir. 2015) (summary order) (affirming summary judgment on the basis that plaintiff had failed to raise a triable issue as to whether the fruits of any labor had been misappropriated); Fewer v. GFI

6

Group, Inc., 124 A.D.3d 457, 459 (1st Dep't 2015) (affirming dismissal of unfair competition counterclaim because "[d]efendants failed to demonstrate that plaintiff misappropriated or exploited confidential information" he obtained while working for former employer). Misuse of confidential information may support a claim for unfair competition. See Advanced Magnification Instruments of Oneonta, N.Y. v. Minuteman Optical Corp., 135 A.D.2d 889, 891 (3d Dep't 1987) (holding that "an employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition" under New York law); Fairfield Fin. Mortg. Grp., Inc. v. Luca, 584 F. Supp. 2d 479, 487 (S.D.N.Y. 2008) (recognizing that even though information may not "qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents for use in a competitor's business constitutes unfair competition").

Under New York law, the damages for unfair competition are limited to "the loss of profits sustained by reason of the improper conduct," and "[t]he offending party's conduct must be a substantial factor in causing the loss." Suburban Graphics Supply Corp. v. Nagle, 5 A.D.3d 663, 666 (2d Dep't 2004) (damages for unfair competition limited because decrease in plaintiff's profits was not entirely due to defendants' solicitations where "[t]he evidence established that customers were dissatisfied with the plaintiff and would have gone elsewhere anyway") (citations omitted); see also Stoeckel v. Block, 170 A.D. 2d 417 (1st Dep't 1991) (Affirming a determination that no damages were appropriate because "[a]lthough defendant established a decline in profits during the period subsequent to plaintiffs'

7

termination, which was the result of a majority of defendant's clients utilizing the services of plaintiff's new enterprise, it was not demonstrated that this decline in business was attributable to plaintiffs' alleged wrongful conduct"); Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, 136 A.D. 2d 633 (2d Dep't 1988); Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649 (S.D.N.Y. 2005).

Further, under New York law, punitive damages are only available on an unfair competition claim "where a defendant's conduct has constituted gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree." 24/7 Records, Inc. v. Sony Music Entm't, Inc., 566 F. Supp. 2d 305, 321 (S.D.N.Y. 2008) (quoting Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d 650, 657 (2d Cir. 1989); see also Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc., 672 F.2d 1095, 1106 (2d Cir. 1982) ("New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness . . . .") (citation omitted).

C. Defamation

"The New York Court of Appeals has defined a defamatory statement as one that exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 177 (2d Cir. 2000) (quoting Kimmerle v. New York Evening Journal, 262 N.Y. 99, 186 N.E. 217, 218 (N.Y. 1933)) (alterations in

8

original). Under New York law, the elements of a defamation claim are: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017) (quoting Stepanov v. Dow Jones & Co., 987 N.Y.S.2d 37, 41-42 (1st Dep't 2014).

Statements that are not published to a third party are not defamatory. See Medcalf v. Walsh, 938 F. Supp. 2d 478, 485 (S.D.N.Y. 2013); see also Ostrowe v. Lee, 256 N.Y. 36, 38, 175 N.E. 505 (N.Y. 1931) ("A defamatory writing is not published if it is read by no one but the defamed."). Furthermore, statements of pure opinion do not support defamation claims. See Kirch v. Liberty Media Corp., 449 F.3d 388, 402 (2d Cir. 2006) ("New York law absolutely protects statements of pure opinion, such that they can never be defamatory.") That said, when an opinion "impl[ies] a basis in undisclosed facts, or facts known only to the author," it may be actionable as a "mixed opinion." Chau v. Lewis, 771 F.3d 118, 129 (2d Cir. 2014). "[T]he dispositive inquiry . . . [is] whether the challenged statement can reasonably be construed to be stating or implying facts about the defamation plaintiff." Flamm v. Am. Ass'n of Univ. Women, 201 F.3d 144, 148 (2d Cir. 2000).

"New York recognizes certain statements as defamatory per se, meaning they are actionable without pleading and proof of special damages." Celle, 209 F.3d at 179 (internal quotation omitted). Although "[t]he line between statements that are defamatory per se and those that require proof of special damages remains fuzzy,"

9

id., courts applying New York law have developed some general rules. As relevant here, "[w]here a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed." Id. at 180 (quoting Ruder & Finn Inc. v. Seaboard Surety Co., 52 N.Y.2d 663, 422 N.E.2d 518, 522 (N.Y. 1981)) (emphasis added). But when allegedly defamatory statements are "confined to denigrating the quality of the business' goods or services" (as opposed to "impugn[ing] the basic integrity or creditworthiness" of the business), a showing of "malice and special damages" is required. Ruder & Finn Inc., 422 N.E.2d at 522 (emphasis added); see also Cambridge Assocs. v. Inland Vale Farm Co., 497 N.Y.S.2d 751, 753 (2d Dep't 1986) (affirming dismissal of per se defamation claim because alleged statements were "directed at plainitffs' product" and "failed to impugn the basic integrity or credit-worthiness of plainitffs' business"); Am. Benefits Corp. v. Admin. Consultants,. Inc., 1989 WL 129495, at *11 (S.D.N.Y. Oct. 26, 1989) (holding that comments directed at the quality of defendants' services "cannot be deemed libelous per se and require special damages to be actionable").

III. DISCUSSION

    A. ECS's Unfair Competition Claim

ECS has alleged, in sum, that CTS used inside knowledge of ECS's customers and pricing information (gained during the term of the Reseller Agreement) to "undercut" ECS's pricing and steal ECS's customers after the Reseller Agreement expired. Given the Court's prior rulings and the lack of evidence of damages, however, that allegation must be dismissed.

10

By Opinion & Order dated March 13, 2017, the Court dismissed a number of ECS's amended claims. See eCommission Sols., LLC v. CTS Holdings, Inc., 2017 WL 985881 (S.D.N.Y. Mar. 13, 2017). Although the Court did not dismiss ECS's unfair competition claim at that time, it did express serious reservations about the legal viability of ECS's core allegation—that CTS improperly used information about ECS's pricing and client base to place predatory bids. Specifically, the Court noted that ECS had not "plead facts establishing that any data was misappropriated," since ECS regularly shared pricing and client information with CTS during the term of the Reseller Agreement. Id. at *9. That was (and is) a problem for ECS, because a claim for unfair competition requires proof that the defendant misappropriated the labor of another in bad faith. See Telecom Int'l Am., Ltd., 280 F.3d at 197. And with specific regard to solicitation of former customers, it is well settled that such conduct is "not actionable unless the customer list could be considered a trade secret or there was wrongful conduct by the employee such as physically taking or copying the employer's files or using confidential information." Amana Express Int'l, Inc. v. Pier-Air Int'l, Ltd., 621 N.Y.S.2d 108, 109 (2d Dep't 1995) (citation omitted).

The only reason the Court did not dismiss ECS's unfair competition claim was because ECS had alleged that, in one specific circumstance, CTS had "used its knowledge of ECS's customer information to place a bid and then also represented to ECS that it had not placed such a bid," and that such conduct made plausible an unfair competition claim based on "fraud or deception." eCommission Sols., LLC,

11

2017 WL 985881 at *9.  But now, on summary judgment, the record is clear that in that particular instance, ECS did not suffer any damages regardless of whether CTS's conduct constituted unfair competition.  Specifically, it is undisputed that the customer in question—Travel Leaders—remained an ECS customer following CTS's surreptitious bid, and that ECS did not suffer any lost profits as a result.

With regards to the other clients that ECS allegedly lost as a result of CTS's conduct, ECS has failed to cure the problem identified by the Court more than a year ago.[6]  An unfair competition claim requires more than a defendant who possesses and uses confidential information.  As the Second Circuit has recognized, "[t]he essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship."  Telecom Int'l Am., Ltd., 280 F.3d at 197 (citations omitted).

CTS may have had information about ECS's pricing strategies, but there is no factual basis to believe CTS did anything fraudulent, deceptive, or abusive to gain that information, which was readily shared while CTS and ECS worked together.  In other words, there is no factual basis that CTS "misappropriated the fruit of plaintiff's labors" in bad faith, as is required.  And CTS may have considered its knowledge of ECS's pricing strategy when the two became competitors, but that

---

[6] The parties dispute whether the Court's Opinion & Order at the motion to dismiss stage formally narrowed ECS's unfair competition claim, or whether ECS is permitted to assert damages as to other clients.  Because the Court concludes that ECS's claim fails for substantially the same reasons as previously identified, it need not specifically address that question.

12

does not and cannot constitute misappropriation absent some underlying misconduct. It would have been impossible, and arguably negligent, for CTS to ignore what it innocently knew (if anything) about ECS's pricing.

Put simply, there is no factual basis to sustain ECS's claim for unfair competition. Although there may be a fact question as to whether CTS deceived ECS vis-à-vis the Travel Leaders bid, ECS did not suffer any damage as a result. And with regards to ECS's other clients, there is no support for the assertion that CTS misappropriated ECS's information or otherwise acted in bad faith. Accordingly, ECS's unfair competition must be dismissed.

B. <u>CTS's Unfair Competition Claim</u>

CTS has alleged, in sum, that ECS misappropriated its proprietary information by attempting to "reverse engineer" certain of the CTS Services prior to expiration of the Reseller Agreement. Given the state of the record, however, that allegation cannot survive summary judgment.

As an initial matter, CTS has failed to raise a triable issue of fact with respect to the underlying question of whether ECS actually misappropriated any of CTS's confidential information. CTS points to e-mails from ECS employees referencing surreptitious "snapshots" of the CTS reporting platform, and apparent efforts to reverse engineer CTS's technology. (<u>See</u> Defs.' Mem. of Law in Opp'n ("CTS Opp'n") at 12-13, ECF No. 145.) But it is undisputed that ECS's effort to reverse engineer the CTS Services was ultimately unsuccessful. And in any event, the cited evidence gives rise to nothing more than pure speculation as to whether

any of ECS's resulting services made use of CTS's proprietary information. (See, e.g., Decl. of Caleb B. Bulls Ex. A-1 (Roberts Dep.) at 297:21-24, ECF No. 130 ("Q. Are you aware of any proprietary information of CTS that has been misappropriated by ECS? A. ECS is a competitor of ours now with the exact same service so in my opinion, all their stuff is probably based on reverse engineering of our systems.").) Speculation is not enough to survive summary judgment.

There is no factual basis in the record for CTS's unfair competition claim. In fact, two of CTS's primary witnesses confirmed as much during sworn depositions in this case:

- First, CTS's President and corporate representative, Carl Roberts, testified that outside of communications with counsel, he did not have a factual basis for CTS's claim that ECS had misappropriated CTS's proprietary information. (See Roberts Dep. at 297:18-298:8, 299:12-16, 300:17-301:2, ECF No. 130.)
- Second, CTS's Chief Executive Officer, Mark Lewington, testified that he was not able to recall any proprietary information that ECS had taken from CTS, and he was not aware of instances in which CTS had competed unfairly against ECS. (Id. Ex. A-2 (Lewington Dep.) at 156:18-24, 157:15-18, ECF No. 130.)

CTS argues that this testimony should not be read as a concession that CTS lacks a factual basis for its claim of misappropriation, because the answers were qualified or otherwise limited to non-privileged knowledge. (See CTS Opp'n at 11-

14

12.)  But that argument does nothing to assist CTS in creating a triable issue of fact.  When a corporate representative testifies to a lack of non-privileged information (or a lack of non-privileged facts), he is testifying that the company itself does not possess non-privileged information (or non-privileged facts).  The possibility that litigation counsel—who is here not a percipient witness—may have information does not change or remedy that.  Ultimately, all that CTS has offered in support of its unfair competition claim is repeated reference to ECS employees taking screenshots of CTS's reporting platform.  But there is <u>no</u> information in the record regarding precisely how the screenshots were used (or misappropriated), or whether they provided any unique/useful information that would not have otherwise been easily available to anyone familiar with technology at a basic level.

Separately, even if the Court assumes there is a triable issue of fact as to misappropriation, CTS's claim fails for a lack of any demonstrated damage.  CTS's corporate representative effectively conceded that CTS has not lost any business as a result of any alleged wrongdoing by ECS.  (<u>See</u> Roberts Dep. at 306:23-307:2; <u>see also</u> CTS Opp'n at 13 (stating that "CTS did not lose any of its direct customers as a result of ECS's misappropriation of CTS's proprietary information").)

In response to ECS's motion for summary judgment on this claim, CTS has argued for the first time that it is entitled to a "reasonable royalty" for the use of its proprietary information, and that this possibility of a "reasonable royalty" provides a sufficient basis to defeat summary judgment.  (<u>See</u> CTS Opp'n at 13-14.)  That argument fails for several reasons.  First, CTS's "royalty" claim is raised for the first

time in opposition to the motion for summary judgment—it was never before disclosed as a damage theory. Second, there still must be some factual basis to conclude that CTS lost profits in order to rely on a "royalty" theory. <u>See, e.g.</u>, <u>LinkCo, Inc. v. Fujitsu Ltd.</u>, 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002) (allowing "reasonable royalty" to calculate damages because lost profits were difficult to establish). Here, the issue is not that CTS's lost profits are <u>difficult</u> to establish, the issue is that CTS has not provided a factual basis to believe it suffered any damage at all. Thus, even if the Court were to accept CTS's untimely assertion of "royalty" damages, there is simply no basis for the Court to find that a reasonable juror could award a royalty. CTS had to do more to demonstrate that it suffered some harm as a result of ECS's alleged misappropriation—the Court will not speculate as to whether a royalty would or would not be possible.

Finally, as previously noted, punitive damages are only available on an unfair competition claim "where a defendant's conduct has constituted gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree." <u>24/7 Records, Inc.</u>, 566 F. Supp. 2d at 321. Here, there is no factual basis supporting even a possibility of punitive damages.

C. <u>CTS's Defamation Claim</u>

CTS's defamation claim fails for multiple, independent reasons. First, on their face, none of the identified statements are defamatory. While unpleasant and perhaps tasteless, the statements are properly categorized as either private, non-published statements, or non-actionable statements of opinion. For instance,

16

calling CTS's CEO a "nut job" is not a statement of fact, but rather understood as conveying opinion. See Kirch, 449 F.3d at 402 ("New York law absolutely protects statements of pure opinion, such that they can never be defamatory."). Similarly, calling the CTS platform a "verified disaster" conveys an opinion, and does not, standing alone, imply a basis in undisclosed facts (such as a scientific study) so as to constitute a "mixed opinion."

Second, there is no evidence in the record that CTS suffered any damage at all as a result of any of the identified statements. Indeed, CTS's corporate representative confirmed as much during his sworn deposition. (See Roberts Dep. at 306:15-22; see also CTS Opp'n at 19 (stating that "CTS did not lose any customers as a result of ECS's defamatory statements).) In its opposition to summary judgment, CTS argues that ECS's statements were defamatory per se, and therefore proof of special damages (in the form of lost profits) is not required. (See CTS Opp'n at 19-20.) But as previously noted, New York law draws a distinction between statements that "impugn[] the basic integrity or creditworthiness of a business," and those that are "confined to denigrating the quality of the business' goods or services." Ruder & Finn Inc., 422 N.E.2d at 522. The former are considered defamatory per se, and the latter are not. Here, none of the identified statements rise to the level of impugning CTS's basic integrity or creditworthiness. Instead, they are confined to denigrating certain portions of the CTS platform and/or expressing ECS's desire to take CTS's customers. As such, there is no factual basis for a per se defamation claim. And given the state of the

17

record, the Court concludes that there is no factual basis for an award of punitive damages either.

## IV. CONCLUSION

For the reasons set forth above, CTS' motion for summary judgment at ECF No. 133 (directed against ECS' single affirmative claim) is GRANTED. Additionally, ECS' motion for summary judgment at ECF No. 128 (directed against CTS' two counterclaims) is also GRANTED. As a result of the Court's prior rulings and this Opinion & Order, all of the claims in this action have been dismissed.

The Clerk of Court is directed to terminate the motions at ECF Nos. 128 and 133 and to terminate this action.

SO ORDERED.

Dated: New York, New York
May 1, 2018

_____
KATHERINE B. FORREST
United States District Judge